

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH/KCB:DEL/RSB
F. #2022R00918

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 17, 2026

By ECF and Email

The Honorable Brian M. Cogan
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Mark Liverano
                Criminal Docket No. 25-384 (BMC)

Dear Judge Cogan:

        The government respectfully submits this letter seeking that the Court exercise its discretion to disqualify the law office of Rubinstein & Corozzo LLP from representing the defendant Mark Liverano in the above-captioned matter because the attorney Joseph Corozzo, Jr., Esq. and the defendant have several overlapping conflicts of interest, as set forth herein and in the government's supplemental ex parte filing.[1]

        First, the government's evidence, which includes hundreds of hours of the defendant's recorded conversations, demonstrates that Mr. Corozzo is fully entangled in the defendant's criminal conduct that will be at issue at trial. Second, at a minimum, the recordings demonstrate that Mr. Corozzo is a fact witness to the criminal conduct in which the defendant has been charged, and the government's use of the recorded conversations about Mr. Corozzo at a future trial would permit Mr. Corozzo to act as an unsworn witness in front of the jury. Third, Mr. Corozzo has previously represented another individual ("Individual-1") who is a witness the government expects to call at trial in this case. Fourth, Mr. Corozzo is the subject of an ongoing investigation into jury bribery and obstruction in the matter of United States v. Goran Gogic, Case No. 22-493, ECF Dkt. No. 191. Even if the defendant were willing to waive the conflicts posed by his representation by Mr. Corozzo, in accordance with the procedures set forth in United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), the government respectfully requests that

---

[1] The government submits the ex parte filing in order to answer the Court's questions posed at the February 10, 2026 status conference. However, the government respectfully submits that the Court can find disqualification is appropriate under Wheat v. United States, 486 U.S. 153 (1988), without relying on the ex parte filing.

the Court decline to accept such waivers. Accordingly, the Court should exercise its discretion under Wheat v. United States, 486 U.S. 153, 159 (1988), to disqualify Mr. Corozzo and the law office of Rubinstein & Corozzo LLP from representing the defendant.

Should the Court conclude that disqualification is not appropriate, the government requests that the Court schedule and conduct a hearing pursuant to United States v. Curcio. At that hearing, the defendant should be permitted to consult with independent Curcio counsel and the Court should obtain the defendant's waiver of the conflicts of interest raised herein. If the Court so requests, the government will submit a proposed Curcio colloquy.

## BACKGROUND

I. Procedural Posture

On December 11, 2025, an indictment against the defendant was returned charging him with: (1) stalking, in violation of 18 U.S.C. § 2261A(2)(B); (2) four counts of extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1); (3) illegal gambling, in violation of 18 U.S.C. § 1955; (4) conspiracy to possess marijuana with intent to distribute marijuana, in violation of 21 U.S.C. § 846; (5) being a felon-in-possession of a firearm, in violation of 18 U.S.C. § 922(g); and (6) attempted obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1) (the "Indictment"). ECF Dkt. No. 1.

The charges stem from the defendant's decade-long operation of an illegal loansharking business in which he offered extortionate cash loans with varying rates of weekly interest. To collect payments, the defendant harmed or threatened to harm the victims or their family members if they did not pay and relied on his violent reputation as a member of the Gambino organized crime family of La Cosa Nostra ("LCN"). On recorded calls, the defendant used coded language, claiming that he was a part of a "crew," and was under consideration for induction into the crime family. In addition to loansharking, the defendant also turned to other criminal schemes to make money, including an illegal gambling operation with members and associates of the Gambino crime family and other LCN families, as well as a conspiracy to distribute marijuana. The defendant also faces charges for interstate stalking, in which he attempted to hire individuals to beat a victim for his perceived disrespect to Liverano; the possession of a weapon as a convicted felon; and his attempt to obstruct a law enforcement investigation by the destruction of evidence.

On December 12, 2025, the defendant was arrested and arraigned on the Indictment and detained pending trial. ECF No. 8. That day, Mr. Corozzo entered a notice of appearance to represent the defendant.

II. Relevant Facts

Since at least 2022, the Federal Bureau of Investigation ("FBI") and the U.S. Attorney's Office have been investigating the defendant and others for extortion, illegal gambling, narcotics trafficking and other criminal schemes. The government employed a variety of investigative techniques to gather evidence, including interviewing witnesses, obtaining judicially authorized search warrants for cell-site location information, executing search warrants of the defendant's premise, conducting physical surveillance, collecting phone records, financial

and banking records and other documentary evidence, and obtaining various recordings of phone and in-person conversations involving the defendant and others.

  A.  <u>Audio Recordings</u>

  In more than a dozen recordings, the defendant is captured discussing Mr. Corozzo's knowledge of the defendant's criminal schemes, namely the illegal gambling and loansharking operations, and discussing Mr. Corozzo's status as an inducted member of the Gambino crime family.[2]  The government would seek to admit these recordings as direct proof of the defendant's guilt at trial.

  For example, in December 2022, the defendant was recorded collecting his portion of proceeds from his illegal gambling operation.  He then instructed an associate of the Gambino crime family to lure bettors for the defendant's illegal gambling operation from another crew in the Gambino crime family.  <u>See</u> GX 1 and GX 1-T.[3]  After asking the associate "how many customers" he had, Liverano stated:  "I was talking to Joe [Corozzo] yesterday, start taking them from the other guy now."  Liverano continued, "They can't say nothing. If they say something?"  Liverano concluded, "He [Corozzo] can handle it."  In this conversation, the defendant stated to another organized crime associate that Mr. Corozzo, his lawyer, knew about his illegal gambling operation and would help enable the defendant poach bettors from a rival gambling operation.

  In another example, in August 2023, in a recorded conversation, the defendant and an associate discussed the continued operation of the defendant's loansharking business if something happened to the defendant.  <u>See</u> GX 2 and GX 2-T.  In the conversation, the defendant refers to a victim of one of the charged loansharking counts by the victim's first name, saying "if the guy [first name's] not paying, you understand what I'm saying?"  The defendant also refers to another victim in one of the loansharking counts charged in the Indictment by his first name, in the same conversation, later stating, "Well, he, he's a sick, he's a stupid fuck, but when I come out I'll kill his kid."  In the same conversation, when discussing how to carry on the loansharking

---

[2] Some of the defendant's statements about Mr. Corozzo, such as the defendant's retention of Mr. Corozzo as his criminal attorney and the close relationship between the defendant and Mr. Corozzo, are corroborated by recordings featuring Mr. Corozzo in 2023.  In these recordings, Mr. Corozzo variously discussed with the defendant and others, among other things, payments from the defendant to Mr. Corozzo, whether certain named individuals had acted as cooperating witnesses for the government and an upcoming trip to Europe that Mr. Corozzo and the defendant intended to take (and did take) together.  The Court can consider these statements, even if the government does not seek to use them against the defendant at trial, as further evidence of the defendant's basis of knowledge.

[3] The government respectfully requests permission to file its audio exhibits and accompanying draft and partial transcripts <u>in</u> <u>camera</u> for the Court's review.  As explained at the February 10, 2026, status conference, and for the reasons stated in the accompanying <u>ex parte</u> filing, these recordings constitute sensitive discovery material and their disclosure implicates witness safety and investigative techniques.

business without the defendant, the defendant explained to the associate, "Talk to Joe [Corozzo] too." The defendant continued, "But I already, I told him, that's why Joe was my best man, you understand? He, I don't have to mention you, you know already know, you understand what I'm saying?" According to multiple confidential sources, as well as numerous recorded statements by the defendant, Mr. Corozzo was the defendant's best man at his wedding. The associate confirmed, "So Joe [Corozzo] knows all this document—" i.e., the status of the defendant's loansharking business. The defendant answered, "Yeah, he knows."[4]

The defendant was also recorded discussing Mr. Corozzo's status as a member of organized crime. In another example, in December 2022, during a conversation with a Gambino crime family associate, the defendant discussed Mr. Corozzo and the Corozzo family advancing in the Gambino crime family ("they're getting more powerful, Joe, and his whole family"), see GX 3 and GX 3-T, and referred to Mr. Corozzo as "Tom Hagen"—a fictional character from "The Godfather" who was both a lawyer and crime family consigliere. See GX 4 and GX 4-T.

In April 2023, in a recorded conversation, the defendant expressly confirmed that Mr. Corozzo "has a button," saying: "Don't say nothing, don't say nothing, but yeah, he does." See GX 5 and GX 5-T. The defendant explained: "They made Joe [Mr. Corozzo]," noting that he is "not a tough guy," so "they straightened him out" so that "he can have like, you know, in the politic game and shit like that." See GX 6 and GX 6-T.

Moreover, in conversations recorded in December 2022, the defendant discussed his hope that he would join "a crew" that reported to Mr. Corozzo's family (Liverano: "I don't want to be around that crew, you understand, if I'm gonna go anywhere I'll go with Joe's [Mr. Corozzo's] Uncle."). See GX 7 and GX 7-T.

The content of these recordings constitute direct evidence of the charged crimes and the government will seek to admit them at trial. In some, the defendant makes direct admissions of his involvement in the charged crimes. For example, in GX 1, the defendant can be heard collecting and discussing gambling proceeds and then asking about the number of customers in the illegal gambling operation. The defendant then directs the associate to "start taking them [customers] from the other guy now," because more bettors mean more profits for the illegal gambling operation (and thus, the defendant). The defendant then explained that Mr. Corozzo will use his position to protect them from the ire of other organized crime members. In another example, in GX 2, the defendant implicated himself in the illegal loansharking operation, explicitly threatening to "kill [the victim's] kid" if the victim did not pay. Here, too, the defendant confirmed three times that Mr. Corozzo — who he identifies as the best man at his wedding — knows about the loansharking operation.

The recordings are also admissible because they show how the defendant used his (and others) connection to the Gambino crime family to facilitate his crimes. Evidence concerning LCN is relevant here because it forms the necessary background to at least five of the

---

[4] The associate then asked whether Mr. Corozzo also had the ledger listing the names of loansharking victims and the amounts owed, asking, "Joe has the list too?" The defendant said no.

nine charges against him. It explains the operation of the defendant's illegal gambling scheme, the other members in that scheme, and payments the defendant made to a higher-ranking organized crime member. It is also relevant to the defendant's operation and enforcement of his loansharking operation, where his reputation as a violent Gambino was known to his victims.

B. Other Information

The government has also learned that Mr. Corozzo previously represented a witness that the government expects to call at trial in this case, about which the government will provide additional information in its accompanying ex parte submission.

Finally, Mr. Corozzo is a subject of the ongoing investigation by law enforcement into the attempt to bribe a juror in United States v. Goran Gogic, Case No. 22-493 (JMA), which was scheduled for trial on November 17, 2025. See Gogic, No. 22-493 (JMA), ECF Dkt No. 191 at 9. On November 3, 2025 and November 5, 2025, the Honorable Clay H. Kaminsky, United States Magistrate Judge in the Eastern District of New York, selected a jury. Id. The morning of November 3, 2025, staff for Judge Kaminsky provided a list of the venire (the "Juror List") to the parties. Id. The Juror List included the first and last names and county of residence for each of the 102 potential jurors in the venire. The court provided each party with paper copies of the Juror List. Id. One juror ("Juror-1") was among those selected to serve as a juror at trial. Id. As set forth in an indictment and court filings in United States v. Krasniqi et al., 25-CR-385 (JMA), after the jury was selected by Magistrate Judge Kaminsky, several conspirators participated in a scheme to approach and attempt to bribe Juror-1 with a cash payment in exchange for Juror-1 agreeing to vote not guilty at Gogic's trial. Id. To the government's knowledge, the only individuals with access to the Juror List were court staff, the Assistant United States Attorneys handling the defendant's prosecution, the defendant, and Mr. Corozzo and other attorneys from Rubinstein & Corozzo. Id. The disqualification motion in Gogic is fully briefed and awaiting decision by the district court. As explained below and for reasons set forth in the ex parte submission, disqualification may be warranted when a defense counsel is under investigation because the counsel may seek to curry favor with the prosecutors' office, potentially at the defendant's expense.

DISCUSSION

I. Applicable Law

A. Overview

The Sixth Amendment affords a criminal defendant the right to effective assistance of counsel. See Wood v. Georgia, 450 U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003). That right, however, is not absolute and does not guarantee the defendant counsel of his own choosing. See United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004); United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993). While there is a "presumption in favor of the [defendant's] chosen counsel, such presumption will be overcome by a showing of an actual conflict or a potentially serious conflict." Jones, 381 F.3d at 119 (citing Locascio, 6 F.3d at 931); see also Wheat, 486 U.S. at 164.

To determine if the defendant's counsel is burdened by a conflict of interest, a district court "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." Jones, 381 F.3d at 119 (internal quotation marks and citations omitted). A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the future." Id. (emphasis and citations omitted).

1. Mandatory Disqualification

If an attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation, the court must disqualify that attorney. See United States v. Lussier, 71 F.3d 456, 461-62 (2d Cir. 1995). Such per se conflicts of interest are not only unwaivable, but are of such a serious nature that if allowed to persist through trial and conviction, on appeal they result in automatic reversal without requiring a showing of prejudice. United States v. Williams, 372 F.3d 96, 103 (2d Cir. 2004). As described more fully below, the Second Circuit has recognized only two categories of conflicts that are unwaivable: where "counsel" is not admitted to the bar of any court and where counsel is implicated in the defendant's crimes.

2. Discretionary Disqualification

Regardless of the severity of the conflict or the defendant's willingness to waive the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." Locascio, 6 F.3d at 931. Accordingly, "a district court should decline to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process." United States v. DiPietro, No. 02 CR 1237 (SWK), 2004 WL 613073, at *4 (S.D.N.Y. Mar. 29, 2004) (citing Wheat, 486 U.S. at 163).

3. Conflicts That May Be Waived

If a conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in United States v. Curcio, 680 F.2d 881 (2d Cir. 1982). See, e.g., Malpiedi, 62 F.3d at 470; Levy, 25 F.3d at 153; United States v. Iorizzo, 786 F.2d 52, 58-59 (2d Cir. 1986). In summarizing Curcio procedures, the Second Circuit has instructed the trial court to:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands

6

> those risks and freely chooses to run them; and (iii) give the
> defendant time to digest and contemplate the risks after
> encouraging him or her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59; see also Curcio, 680 F.2d at 888-90.  By relying on waivers of potential conflict claims, courts are spared from having to wade into the intricacies of those claims. United States v. Jiang, 140 F.3d 124, 128 (2d Cir. 1998).

Finally, the need for a Curcio hearing exists regardless of whether a case is disposed of by way of guilty plea or trial.  "A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel." United States v, Stantini, 85 F.3d 9, 15 (2d Cir. 1996).  Likewise, "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered." Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996).  Therefore, it necessarily follows that a defendant has a right to conflict-free representation during the plea negotiation stage.  See id. ("[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.") (quoting Von Moltke v. Gillies, 332 U.S. 708, 721 (1948) (emphasis added)); see also Stantini, 85 F.3d at 16-17 (suggesting that ineffective assistance of counsel may be shown if attorney's dual representation led to inadequate advice "with respect to the advantages or disadvantages of a plea").

    B.    Relevant Conflicts

        1.    Defense Attorney's Involvement in Criminal Conduct

As noted above, the Second Circuit has found that it is an unwaivable conflict when a defense attorney is "implicated in the crimes of his or her client." United States v. Gambino, 838 F. Supp. 749, 754 (S.D.N.Y. 1993) (quoting United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993)).  In that situation, "the attorney cannot be free from fear that 'vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrong doing.'" Id.

Even allegations that defense counsel is entangled in the facts of the defendant's criminal conduct may create an unwaivable conflict of interest.  See Williams, 372 F.3d at 105 (finding unwaivable conflict of interest where counsel unlawfully exchanged firearms with defendant indicted for using firearms in furtherance of his criminal activities); Fulton, 5 F.3d at 609-10 (finding that defendant convicted of heroin trafficking was deprived of effective assistance of counsel where a government witness alleged that counsel received part of the heroin linked to defendant and was involved in heroin trafficking).  "If the allegations are true, an attorney cannot freely advise the client whether to cooperate, or whether to take the stand at trial, for fear that the client could reveal information implicating the attorney." United States v. Pizzonia, 415 F. Supp. 2d 168, 182 (E.D.N.Y. 2006) (citing Fulton, 5 F.3d at 610).  See also United States v. Gotti, 9 F. Supp. 2d 320, 324 (S.D.N.Y. 1998) ("[T]he attorney's desire to minimize his own involvement in the events in question or to characterize his own conduct favorably creates pressures potentially inimical to his client's interests." (citing Locascio, 6 F.3d at 933; United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989))).  "If the allegations are false, the attorney cannot examine the government witness regarding the allegations against the

7

attorney without in effect becoming an unsworn witness." Pizzonia, 415 F. Supp. 2d at 182. See also Locascio, 6 F.3d at 931-34 (disqualification is warranted should defense counsel either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused").

### 2. An Attorney As an Unsworn Witness

A lawyer is generally barred from acting as both an advocate and a witness in the same proceeding. Model Rules of Professional Conduct Rule 3.7(a); Ciak v. United States, 59 F.3d 296, 304-05 (2d Cir. 1995); see also Hon. John Gleeson, Gordon Mehler & David C. James, Federal Criminal Practice: A Second Circuit Handbook § 8-6 (25th ed. 2025). "The risk that [a lawyer will] become a witness at trial [is] enough alone to . . . reach this determination [to disqualify] under an abuse of discretion standard," Jones, 381 F.3d at 121, provided that the testimony at issue is squarely relevant. United States v. Kwang Fu Peng, 766 F.2d 82, 87 (2d Cir. 1985).

In Kliti, the Second Circuit vacated a conviction and ordered a new trial where it became apparent during the trial that the defense attorney could have been called as a fact witness to support his client's defense, but was not permitted to testify, and where the court did not obtain a Curcio waiver from the defendant. See Kliti, 156 F.3d at 155-57. Specifically, during the government's direct case, the government called an accomplice witness to provide evidence of the defendant's participation in the charged counterfeit check scheme. See id. at 155. During cross-examination, the accomplice witness denied ever telling Kliti, Kliti's attorney Sarikas, and a third party that Kliti had "absolutely nothing to do with" the counterfeit check scheme. Id. at 155-56. Defense counsel explained to the court, out of the jury's presence, that the accomplice witness had, in fact, made that statement. See id. at 155. However, because Kliti chose not to testify at trial and because the third party invoked his Fifth Amendment privilege and refused to testify, Sarikas was the only other witness who could be called to refute the accomplice's version of events. See id. at 155-56. At that point, Sarikas was "in a clear conflict because he was faced with the choice of (1) testifying on behalf of his client, which would result in his disqualification, or (2) not presenting evidence of the exculpatory statement." Id. at 156 (footnote omitted). A Curcio hearing was neither requested nor undertaken, Sarikas did not testify, and the defendant was convicted.

The Second Circuit vacated the conviction. Under the above-described circumstances, the district court

> was obligated to question Kliti, in accordance with Curcio, to determine whether he was willing to waive his right to a conflict-free lawyer and to forgo confronting [the accomplice witness] with the exculpatory statement through the testimony of Sarikas. The [district] court should have explained to Kliti that Sarikas could not be a witness — sworn or unsworn — while Sarikas was representing Kliti, but that if Kliti were represented by another attorney, that attorney would be able to call Sarikas as a witness and have him testify about the statement.

8

Id. at 156-57.

"Courts have also considered disqualification where the chosen counsel is implicated in the allegations against the accused and could become an unsworn witness for the accused." Locascio, 6 F.3d at 931 (citing United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989)). "An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." Locascio, 6 F.3d at 933. Irrespective of whether the attorney is actually called as a witness, "he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question . . . . Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." Id. (collecting cases).

For example, in Locasio, the appeal of John Gotti's conviction, Gotti's first choice of counsel, Cutler, had been present during discussions surreptitiously recorded by the government. As the Second Circuit wrote, affirming the district court's disqualification, "[t]he clearest support for [the district court's] finding was Cutler's presence during . . . discussions taped by the government. The government was legitimately concerned that, when Cutler argued before the jury for a particular interpretation of the tapes, his interpretation would be given added credibility due to his presence in the room when the statements were made." Id. at 934. The court wrote that an attorney could frame his own views as legal argument, which "would have given Gotti an unfair advantage, since Cutler would not have had to take an oath in presenting his interpretation." Id.

The Second Circuit has noted that agreeing "to limit inquiry to avoid the problem of counsel as an unsworn witness may be appropriate in some circumstances," Kliti, 156 F.3d at 156 n.7 (reversing conviction for failure to hold Curcio hearing to determine if defendant consented to limiting cross-examination), or that a stipulation may be used to avoid disqualification of an advocate-witness. Torres v. Donnelly, 554 F.3d 322, 326 (2d Cir. 2009) (conflict negated by stipulation that obviated need for defense counsel's testimony).

However, where defense counsel is entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to waive. Locascio, 6 F.3d at 931-34. Because the government, not the defendant, is prejudiced, "waiver . . . by the defendant is ineffective in curing the impropriety in such situations." Id. at 931, 934; see also United States v. Liszewski, No. 06 CR 130 (NGG), 2006 WL 2376382, at *3 (E.D.N.Y. Aug. 16, 2006).

3. Representation of Government Witnesses

An attorney's representation of a government witness presents an inherent conflict of interest. A serious conflict may also arise if the defendant wished to cooperate with the government's investigation and testify as to facts inculpating the other client. See Locascio, 6 F.3d at 931; United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir. 1986); Restatement (Third) of the Law Governing Lawyers § 121 (2000) (recognizing that a serious problem arises when "there is

9

a substantial risk that the lawyer's representation of the client would be materially and adversely affected by . . . the lawyer's duties to . . . a former client . . . ."). This is because a lawyer owes an absolute duty of loyalty and confidentiality to both his current and former clients. See United States v. Yannotti, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004); United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); ABA Model Code of Professional Responsibility, Ethical Consideration 4-6. That duty, which remains in force even after representation ends, precludes the lawyer from disclosing matters revealed to him by reason of the confidential relationship, absent release from that duty under the law. See Rahman, 861 F. Supp. at 274; EC 4-6 ("The obligation to protect confidences and secrets of a client continues after the termination of employment."). Therefore "unless the . . . client waives these obligations, the attorney's . . . representation creates the potential for a serious conflict of interest." Yannotti, 358 F. Supp. 2d at 295. Furthermore, in evaluating an actual or potential conflict of interest, actions of any member of a law firm are imputed to every member of the firm. E.g., United States v. Jiang, 140 F.3d 124, 127 (2d Cir. 1998).

That means that, in representing a current client, a lawyer may not use privileged information obtained from another client. See United States v. James, 708 F.2d 40, 45-46 (2d Cir. 1983); United States v. Cunningham, 672 F.2d 1064, 1072-73 (2d Cir. 1982). Moreover, in representing a current client, a lawyer may not attack other clients through cross-examination or argument to the jury. See Pizzonia, 415 F. Supp. 2d at 177-78; Rahman, 861 F. Supp. at 277; United States v. Massino, 303 F. Supp. 2d 258, 262 (E.D.N.Y. 2003) ("Because of [the attorney's] prior representation of [the cooperating witness], [the attorney] cannot ethically cross examine [the cooperating witness] without his consent."); United States v. Falzone, 766 F. Supp. 1265, 1275 (W.D.N.Y. 1991) (finding it improper for an attorney to cross-examine his prior client because the attorney is in a position to use information gleaned from the prior representation "either purposely or inadvertently").

The duty of loyalty to his other client thus effectively precludes a lawyer from vigorously cross-examining the other client or commenting on his credibility, which may be essential to the effective representation of the present client. See United States v. Kelly, 870 F.2d 854, 856-57 (2d Cir. 1989) (finding disqualification necessary because the defendant's interests would best be served by "vigorous cross-examination of the informant in a manner wholly inconsistent with the informant's interests" — a task that defense counsel could not perform without "violat[ing] the rights of the informant" to expect continued loyalty and confidentiality from his former attorney); Malpiedi, 62 F.3d at 469 (finding that the lawyer was prohibited from seeking to "conduct a thorough, no-holds-barred cross-examination . . . because of [the lawyer's] obligations as [the witness's] prior attorney").

Notwithstanding the limitations outlined above, a defendant can generally waive potential conflicts arising from his attorney's prior representation of a co-conspirator. See Perez, 325 F.3d at 124 (citing Fulton, 5 F.3d at 613). The Second Circuit has recognized that "[o]ur cases . . . support allowing waiver of the conflict that arises when an attorney must cross examine a former client in order to effectively represent a current client." United States v. Oberoi, 331 F.3d 44, 50 (2d Cir. 2003). Such a waiver is allowed because:

10

> Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo; he "can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration in the trial strategy against the perceived effect of having to get a new and perhaps less effective defense counsel."

Perez, 325 F.3d at 124 (quoting Fulton, 5 F.3d at 613).

### 4. An Attorney Who Is the Subject of an Ongoing Investigation

Courts have long recognized that a defense attorney who is under investigation by the government has a potential conflict of interest. See Armienti v. United States, 234 F.3d 820, 824 (2d Cir. 2000); United States v. Reyes-Vejerano, 276 F.3d 94, 99 (1st Cir. 2002). As the Second Circuit has explained:

> A lawyer in these circumstances, while dealing on behalf of his client with the office that is prosecuting him personally may, consciously or otherwise, seek the goodwill of the office for his own benefit. A lawyer's attempt to seek the goodwill of the prosecutor may not always be in the best interest of the lawyer's client.

Armienti, 234 F.3d at 824. The conflict, however, may be waived so long as "the attorney's alleged criminal activity [is not] sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised." Fulton, 5 F.3d at 611.

### 5. Cumulative Prejudice

Finally, in cases, like this one, where numerous conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyers and his client." Rahman, 861 F. Supp. at 274; see also Levy, 25 F.3d at 157.

## II. Analysis

Based on the facts set forth above, the government respectfully submits that the Court should exercise its discretion under Wheat and disqualify Mr. Corozzo from serving as counsel to the defendant.

First, the government's evidence demonstrates that Mr. Corozzo is fully entangled in the defendant's criminal conduct warranting Mr. Corozzo's disqualification. In United States v. Napoli, the Honorable John Gleeson disqualified the law office of Rubinstein & Corozzo LLP from representing the defendant at trial based on evidence from which a factfinder could reasonably infer that Mr. Corozzo was implicated in witness tampering as to which the defendant was charged. No. 10-CR-150 (JG), 2010 WL 1687669, at *2 (E.D.N.Y. Apr. 27, 2010). As the court in Napoli wrote:

11

> Defense counsel may, for example, refrain from preparing a zealous defense against the charges or from advising his client to accept a plea agreement with the government for fear that evidence of counsel's crimes may be discovered. In such situations, advice as well as advocacy is permeated by counsel's self-interest, and no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation.

Id. Similarly, in United States v. Curanovic, the Court disqualified Mr. Corozzo in light of evidence that a government witness implicated Mr. Corozzo in a loansharking operation related to the charges faced by the defendant and that Mr. Corozzo was a subject of a criminal investigation being conducted by the United States Attorney's Office. No. 08-CR-240 (BMC), 2011 WL 1555075, at *3-4 (E.D.N.Y. Apr. 1, 2011). This Court found that "Mr. Corozzo has a strong interest in self-protection that could readily manifest itself in a way that is directly contrary to [the defendant's interests]" and that this kind of "client-conflicting self-interest is perhaps the best indicator of an unwaivable conflict." Id. This Court concluded that even if it were to find that "the per se rule does not apply and that this conflict is waivable," it would still exercise its discretion and deny the defendant's waiver in light of significant problems associated with Mr. Corozzo's continued representation and its "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. (Wheat, 486 U.S. at 160).

      Here, as in Napoli and Curanovic, there is a significant risk that Mr. Corozzo and by extension, his firm, have a personal interest in defending against allegations that Mr. Corozzo knew about (and facilitated) the defendant's illegal gambling and loansharking operations. As set forth above, the defendant stated to another organized crime associate that Mr. Corozzo, his lawyer, knew about his illegal gambling operation and would help enable its expansion. The defendant also directed an associate to contact Mr. Corozzo in the event the defendant was no longer able to collect his illegal loansharking payments, confirming that Mr. Corozzo knew about the operation. The defendant also explained that Mr. Corozzo himself is an inducted member of the Gambino crime family, and that he (the defendant) hoped to join the Corozzo family "crew." Under these circumstances, it is unlikely that Mr. Corozzo would be in a position to represent the defendant without seeking to protect himself and defend the propriety of his own conduct, potentially at the defendant's expense.

      Second, the defendant's recorded discussions with and about Mr. Corozzo also demonstrate that Mr. Corozzo is a fact witness to the criminal conduct with which the defendant has been charged, and Mr. Corozzo would be an unsworn witness in front of the jury. This situation would give the defendant "an unfair advantage, since [Mr. Corozzo] would not have had to take an oath in presenting his interpretation, but could merely frame it in the form of legal argument." Locascio, 6 F.3d at 933. This puts both the government and the Court at a disadvantage because "the factfinding process is impaired." Id. Accordingly, Mr. Corozzo's role as an unsworn witness further warrants his disqualification.

      Third, Mr. Corozzo has represented a witness that the government anticipates calling at a future trial against the defendant. In his prior representation of the witness, Mr.

12

Corozzo has gained privileged and confidential information. Given that representation, there exists a tension between the witness and Mr. Corozzo despite Mr. Corozzo's duty of loyalty to the witness as a prior client. Additionally, Mr. Corozzo cannot cross-examine the witness using the privileged information obtained during his representation of the witness as he owes a duty of loyalty to the defendant and his prior client. For these reasons, the Second Circuit has held that in situations like this one, an attorney may be disqualified because of his "prior representation of a witness or co-defendant." Locascio, 6 F.3d at 931. "Courts in this Circuit generally have recognized that '[b]ecause an attorney's duties of loyalty and confidentiality to his clients remain in force after the termination of the attorney's retainer, . . . unless the former client waives these obligations, the attorney's prior representation creates the potential for a serious conflict of interest' that may require that the attorney be disqualified." United States v. Roderique, No. 21-CR-56 (JPC), 2022 WL 1557547, at *1 (S.D.N.Y. May 17, 2022).

Furthermore, the applicable legal ethics rules preclude Mr. Corozzo from using information he learned from a prior client that is relevant or useful to the defendant in the current case, thus adversely affecting his representation of the defendant. See N.Y. R. Prof'l Conduct 1.6 ("A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person," unless the client gives informed consent); N.Y. R. Prof'l Conduct 1.9(c) ("A lawyer who has formerly represented a client in a matter . . . shall not thereafter: (1) use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client . . . or (2) reveal confidential information of the former client protected by Rule 1.6[.]"). There is no indication that a waiver from the witness is forthcoming, or that this Court should accept the defendant's waiver should he waive. Cf. United States v. Lussier, 71 F.3d 456, 462 (2d Cir. 1995) (attorney's conflict is "significantly diminished" and can be waived where attorney was free to cross-examine former client who waived privilege).

Fourth, and finally, Mr. Corozzo is under federal investigation in the matter of United States v. Goran Gogic, Docket No. 22-493, for jury bribery and obstruction. In that matter, while the government filed a supplemental ex parte filing detailing more information about the ongoing investigation, the publicly available filing, ECF No. 191, indicates that Mr. Corrozo is the lead attorney in the matter where there was an attempt to bribe a juror, where "to the government's knowledge, the only individuals with access to the Juror List were court staff, the Assistant United States Attorneys handling the defendant's prosecution, the defendant, and the Rubinstein & Corozzo Attorneys." ECF No. 191 at 9. Under these circumstances, there is a risk that Mr. Corozzo would "attempt to seek the goodwill of the prosecutor," even if not in the best interest of his client. See Armienti, 234 F.3d at 824. If this were the only issue, the government would ask the Court to hold a Curcio hearing to ensure the defendant wants to be represented by an attorney who is currently under investigation by the same prosecuting office for serious crimes, namely bribing a juror and obstruction. However, this is not the only conflict raised by this representation.

Instead, in cases where, as here, numerous conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client." United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); see also Levy, 25 F.3d at 157. While each of these grounds standing alone presents a compelling, if not mandatory, basis for disqualification, taken

13

cumulatively, as the law requires, they dictate that the Court should exercise its discretion to disqualify Mr. Corozzo from this case. Moreover, given the numerous conflicts of interest already presented by Mr. Corozzo's representation of the defendant, it is likely that additional conflicts of interest, currently unforeseen, will materialize as the case progresses. See Wheat, 486 U.S. at 162-63 ("The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.").

## CONCLUSION

For the foregoing reasons, Court should exercise its discretion and disqualify Mr. Corozzo from representing the defendant. In the event the Court wishes to advise the defendant of the conflicts set forth herein, the government will provide proposed questions in advance of any court proceeding.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Devon Lash
Raffaela S. Belizaire
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (BMC)
       Joseph Corozzo, Jr., Esq.